## Case No. 12,005.

### ROGERS v. The AMADO.

[Newb. 400.] [2]

District Court, E. D. Louisiana. Feb., 1847.

PRIZE — ENEMY PROPERTY — OWNERSHIP — FOREIGNER DOMICILED IN ENEMY COUNTRY —EXEMPTING PROPERTY.

1. Where a Frenchman by birth, had resided thirteen years in the republic of Mexico it was held, that he had acquired a domicil in the enemy's country which subjected him, so far as it related to his property, to all the disabilities of an enemy; therefore, a vessel with her cargo, both owned by him, found sailing under the

flag of the enemy, was considered liable to seizure and condemnation as prize of war.

2. To exempt the property of enemies from the effect of hostilities is a very high act of sovereign authority. If delegated to persons in a subordinate situation, it must be exercised either by those who have a special commission granted to them for the particular business, and who in legal language, are termed mandatories, or by persons in whom such a power is vested in virtue of any official situation to which it may be considered incidental.

3. No consul in any country, particularly in an enemy's country, nor the commander of an American frigate, has any authority to grant any license or permit which could have the legal effect of exempting the vessel of an enemy from capture and confiscation.

4. If there be anything in a license or permit granted by a consul, or a commander of an American frigate, to entitle a claimant to the equitable consideration of the government, it is to the executive or legislative department he must apply. A court of prize is governed by the laws of war, and can look only at the legal effect of such documents when introduced in evidence.

5. Time is the grand ingredient in constituting domicil; and in most cases it is unavoidably conclusive. The animus manendi is the point to be settled, and the presumption arising from actual residence in any place, is that the party is there animo manendi; and it lies upon him to remove the presumption, if it should be requisite for his safety.

[This was a libel by Lieut. Henry J. Rogers and the United States against the Mexican schooner Amado and cargo. Heard on application for a decree of forfeiture.]

T. J. Durant, for the United States.

T. A. Clarke, for captors.

P. Soule, for claimant.

McCALEB, District Judge. This vessel was taken by the fleet under the command of Commodore Perry at Frontera de Tabasco, in the month of November last, and sent to this port for condemnation. The libel states "that pursuant to instructions for that purpose from the president of the United States and from Commodore Matthew C. Perry, commander of the United States steamship of war Mississippi, the libelant (Henry Rogers), with a cutter and crew belonging to the said steamship of war, did on the —— day of November, 1846, enter the river Tabasco, within the territory of the republic of Mexico, and then and there seize and take the said Mexican schooner Amado, with all her apparel, tackle, furniture and cargo, consisting of cocoa, sugar, and other goods, wares and merchandise found lying in the said river Tabasco; that at the date of her capture the said schooner and her cargo were the property of citizens and residents of the republic of Mexico and enemies of the United States." For the reasons here alleged a decree of forfeiture is demanded on behalf of the captors and of the United States.

A claim and answer has been filed on behalf of one Jean Baptiste Capdebou by A. Capdeville, acting as his agent. In this, it is alleged, that the claimant is an alien absent

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

[2] [Reported by John S. Newberry, Esq.]

from the state, but is the sole owner of the schooner and cargo: that he is a French citizen, and has been for some time past, engaged in trade in the republic of Mexico, under the protection of the treaties entered into by the said republic with the French government. It is further alleged, that in order to avail himself in the pursuit of his trade, of the advantages and facilities to be derived from transportation in Mexican bottoms, the claimant purchased the schooner and sailed in her under Mexican colors: that since the commencement of the war between the United States and Mexico, he ventured the said schooner and the goods on board of her under Mexican colors, with the express permission of the American consul at Terra de Tabasco, and with the implied as well as express assent of the chief officers of the American squadron at Vera Cruz, who gave him a written protection in return for the good services which he had the good fortune to render them. He therefore contends that his property should be regarded as neutral, and as such not liable to confiscation.

The deposition of Benito Bosch (the master of the vessel), in answer to the standing interrogatories, shows that Capdebou, the owner of the vessel, is a Frenchman by birth, and has lived in Tabasco for thirteen years: that he does business in Tabasco: and that the goods on board were for his account and risk. This witness also declares that the schooner sailed under Mexican colors and had no other colors on board. We have thus the unequivocal declarations of both the claimant and the master, that the national character of the vessel was Mexican. Nor is this character destroyed by the alleged license of the American consul at Terra de Tabasco, to assume the flag of the enemy; nor by the permit of Capt. Gregory of the frigate Raritan, bearing date off Vera Cruz, June 2d, 1846, authorizing this schooner to pass from Vera Cruz to Guascualco, Tabasco, and to return. Neither the American consul nor the commander of the American frigate, had any authority whatever, by virtue of their official stations, to grant any license or permit, which could have the legal effect of exempting the vessel of an enemy from capture and confiscation. "To exempt the property of enemies from the effect of hostilities," says Sir William Scott in the case of The Hope, "is a very high act of sovereign authority; if at any time delegated to persons in a subordinate situation, it must be exercised either by those who have a special commission granted to them for the particular business, and who in legal language are termed mandatories, or by persons in whom such a power is vested in any official situation to which it may be considered incidental. It is quite clear that no consul in any country, particularly in an enemy's country, is vested with any such power in virtue of his station. 'Ei rei non præparitur;' and, therefore, his acts relating to it are not bind-

ing. Neither does the admiral, on any station, possess such authority. He has, indeed, power relative to the ships under his immediate command, and can restrain them from committing acts of hostility, but he cannot go beyond that; he cannot grant a safeguard of this kind beyond the limits of his own station. The protections, therefore, which have been set up, do not result from any power incidental to the situation of the persons by whom they were granted; and it is not pretended that any such power was specially intrusted to them for the particular occasion. If the instruments which have been relied upon by the claimants are to be considered as the naked acts of these persons, then are they, in every point of view, totally invalid." The Hope, 1 Dod. 226.

It is, however, due both to the American consul and the commander of the frigate Raritan, to say, that from an inspection of the documents relied on as permits or licenses, they were evidently never intended to have the force and effect claimed for them by the proctor of the claimant. The one signed by the consul, and bearing date at Frontera de Tabasco, July 22d, 1846, is merely a recommendation of Capdebou to the favorable consideration of the officers of the American squadron on account of his having on many occasions rendered friendly advice and pecuniary assistance to American citizens at a time when there was no American consul at the port of Tabasco. This letter of recommendation (for it is nothing else) concludes thus: "I have known Mr. Capdebou for many years, and my long acquaintance with him, has caused me to form so favorable opinion of him, together with the fact of his being a subject of our oldest and firmest friend and ally, France, that I am emboldened to hope and even to ask, that in case his vessel should be taken by any of you, gentlemen, you will, if your duty will permit it, suffer him to continue his voyage with his vessel and cargo, as he assures me he has nothing contraband of war on board of his vessel, her cargo consisting of the products of this department—principally cocoa." If there be anything in this communication to entitle the claimant to the equitable consideration of our government, it is to the executive or legislative department that his application must be made. Sitting as a court of prize, this tribunal can only be governed by the principles of the laws of war, and will look only to the legal effect of the evidence adduced. The permit from the commander of the frigate Raritan relied on by the claimant, is dated off Vera Cruz, June 2d, 1846, and is as follows: "The Mexican schooner Amado has permission to pass from Vera Cruz to Guascualco, Tabasco, with five persons composing her crew, and a family of passengers, with their effects; and the said schooner has permission to return."

Let us suppose for the sake of argument, that the legal effect of this permit would

have been to exempt the vessel from liability to capture on the particular voyage she was then prosecuting; it would yet be most unreasonable to extend the privilege conferred by the very terms of the document itself. It was intended as an authority to the schooner to proceed from Vera Cruz to Tabasco, and to return to the former port, and yet I am called upon to give it a construction which would destroy the rights of captors acquired by a seizure of the vessel and cargo within the territory of the enemy, six months after it was granted, and when, I am bound to suppose, the particular voyage for which it was granted, had long been performed. The deposition of the master showed that the schooner had on board a "national passport," that is to say, a passport from the Mexican government.

It is a well settled principle of the law of prize, that sailing under the flag and pass of an enemy, is one of the modes by which a hostile character may be affixed to property; for if a neutral vessel enjoys the privileges of a foreign character, she must expect, at the same time, to be subject to the inconveniences attaching to that character. The rule is necessary to prevent the fraudulent mask of enemy's property. "The existence and employment of such a license," says Mr. Justice Story, in delivering the opinion of the supreme court of the United States in the case of The Julia, 8 Cranch [12 U. S.] 199, "affords strong presumption of concealed enemy interest, or at least of ultimate destination for enemy use. It is inconceivable that any government should allow its protection to an enemy trade merely out of favor to a neutral nation, or to an ally, or to its enemy. Its own particular and special interests will govern its policy; and the quid pro quo must materially enter into every such relaxation of belligerent rights. It is, therefore, a fair inference either that its subjects partake of the trade under cover, or that the property, or some portion of the profits, finds its way into the channel of the public interests." In the case of The Saunders [Case No. 12,372]. the same learned admiralty judge decided that. by the general law of prize, as long as a vessel retains the hostile character consequent upon the use of an enemy's license, it is subject to all the penalties of such character; and if captured in delicto, the vessel is confiscable jure belli. In the case of The Ariadne. 2 Wheat. [15 U. S.] 143, the supreme court of the United States held that sailing under the enemy's license, constituted, of itself, an act of illegality which subjects the property to confiscation, without regard to the object of the voyage, or the port of destination.

A distinction is made in the cases decided in the high court of admiralty in England between the ship and cargo. Some countries have gone so far as to make the flag and pass of the ship conclusive on the cargo also. It is true that the decision of Sir William Scott in the case of The Vrow Elizabeth, 5 C. Rob. Adm. 2, does not carry the principle to that extent as to cargoes laden before the war. The rule laid down by that distinguished judge was to hold the ship bound by the character imposed upon it by the authority of the government from which the documents issue. Goods, which had no such dependence upon the authority of the state, might be differently considered; and if the cargo be laden in time of peace, though documented as foreign property in the same manner as the ship, the sailing under the foreign flag and pass was not held conclusive as to the cargo. But let us suppose that the cargo, as in this case, belonged to the owner of the vessel, and were laden in time of war, and there is no reason to suppose that the rule of the English courts would have varied from that which has been recognized by the admiralty tribunals in this country. "The doctrine of the American courts," says Chancellor Kent, in his Commentaries on the Law of Nations (lecture 4, p. 85), "has been very strict on this point, and it has been frequently decided that sailing under the license and passport of protection of the enemy in furtherance of his views and interests, was, without regard to the object of the voyage or the port of destination, such an act of illegality as subjected both ship and cargo to confiscation as prize of war."

But the proctor of the claimant has contended that his client is a subject of the French government, and as such is entitled to all the rights of a neutral. This position cannot be maintained. For all the purposes of argument it may safely be admitted that the claimant is still a subject of France; or in other words that he has never become a naturalized citizen of the republic of Mexico. Yet from the examination in preparatorio, it plainly appears that he has resided in Mexico for thirteen years; and there is no principle of prize law better settled than that the property of a person settled in the enemy's country, although he be a neutral subject, is affected with the hostile character. The Ann Green [Case No. 414]. It is equally well settled that the property of a person may acquire a hostile character although his residence be neutral. Therefore, where a person is engaged in the ordinary or extraordinary commerce of an enemy's country, upon the same footing, and with the same advantages as native resident subjects, his property employed in such trade, is deemed incorporated into the general commerce of that country and subject to confiscation, be his residence where it may. And it was held by Mr. Justice Story, in the case of The San Jose Indiano [Id. 12,322]. that if there be a house of trade established in the enemy's country, and habitually and continually carrying on its trade, with all the advantages and protection of subjects of the enemy, a shipment by such house on its own account, though one of the parties be resident in a

neutral country, is purely of the enemy character; and the share of such partner in the property is not to be excepted from this thorough incorporation into the enemy's character. Mr. Wheaton, in his work on Maritime Captures (chapter 4, p. 101) says that the property of persons domiciled in the enemy's country, is liable to capture and condemnation, although such persons may be citizens or subjects of the belligerent state or of neutral powers; and that a person who resides under the protection of a hostile country, for all commercial purposes, is to be considered to all civil purposes, as much an enemy as if he were born there. In the case of Murray v. The Charming Betsey, 1 Cranch [5 U. S.] 65, the supreme court of the United States decided that a citizen residing in a foreign country might acquire the commercial privileges attached to his domicil, and thus be exempt from the operation of a law of his original country restraining commerce with another foreign country.

As the person who has a commercial inhabitancy in the hostile country has the benefits of his situation, so also he must take its disadvantages. ."Qui commodum sentit, sentire debet et onus," is the maxim of the civil law. Wheat. Mar. Capt. 102. "It becomes important," says in a maritime war," says Chancellor Kent, (lecture 4), "to determine with precision what relations and circumstances will impress a hostile character upon persons and property; and the modern international law of the commercial world, is replete with refined and complicated distinctions on this subject. It is settled that there may be a hostile character merely as to commercial purposes, and hostility may attach only to the person as a temporary enemy, or it may attach only to property of a particular description. This hostile character, in a commercial view, or one limited to certain intents and purposes only, will attach in consequence of having possessions in the territory of the enemy, or by maintaining a commercial establishment there, or by a personal residence, or by particular modes of traffic, as by sailing under the enemy's flag or passport." And again he says: "If a person has a settlement in a hostile country by the maintenance of a commercial establishment there, he will be considered a hostile character, and a subject to the enemy's country, in regard to his commercial transactions" connected with that establishment. The position is a clear one, that if a person goes into a foreign country and engages in trade there, he is, by the law of nations, to be considered a merchant of that country, and a subject to all civil purposes, whether that country be hostile or neutral; and he cannot be permitted to retain the privileges of a neutral character during his residence and occupation in an enemy's country. He takes the advantages and disadvantages, whatever they may be, of the country of his residence. This doctrine is founded on the principles of national law, and it accords with the reason and practice of all civilized nations. "Migrans jura amittat ac privilegia et immunitates domicilii prioris," Voet, Comm. Pand. tome I, 347; [The Chester v. The Experiment] 2 Dall. [2 U. S.] 41. According to Gro. De Jure B. 563, all the citizens or subjects of the enemy, who are such from a permanent cause, that is to say, settled in the country, are liable to the law of reprisals whether they be natives or foreigners; but not so if they are only traveling or sojourning for a short time. And according to Moll. de J. Mar. bk. 1, c. 2, § 16, it is not the place of any man's nativity but of his domicil; not of his origination but of his habitation, that subjects him to reprize. The law doth not consider so much where he was born, as where he lives; not so much where he came into the world, as where he improves the world. In the judgment of the lords of appeal, in prize causes, upon the cases arising out of the capture of St. Eustatius by Admiral Rodney, delivered in 1785, by Lord Camden, he stated that "if a man went into a foreign country upon a visit, to travel for health, to settle a particular. business, or the like, he thought it would be hard to seize upon his goods; but a residence not attended with these circumstances, ought to be considered as a permanent residence." In applying the law and evidence to the resident foreigners in St. Eustatius, he said that, "in every point of view, they ought to be considered resident subjects. Their persons, their lives, their industry, were employed for the benefit of the state under whose protection they lived; and if war broke out, they continuing to reside there, paid their proportion of taxes, imposts and the like, equally with natural born subjects, and no doubt came within that description." Wheat. Int. Law, 370.

It has been a question admitting of much discussion and difficulty, arising from the complicated character of commercial speculations, what state of facts constitutes a residence so as to change or fix the commercial character of the party. "Time," says Sir William Scott in the case of The Harmony, 2 C. Rob. Adm. 324, "is the grand ingredient in constituting domicil. In most cases it is unavoidably conclusive." And in that case that eminent civilian decided that four years were sufficient to fix the domicil of the party. The animus manendi is the point to be settled, and in the case of The Bernon, 1 C. Rob. Adm. 106, it was held that the presumption arising from actual residence in any place, is, that the party is there animo manendi, and it lies upon him to remove the presumption, if it should be requisite for his safety.

From the authorities here cited, it is clear that I am not called upon to take into consideration the citizenship of the claimant in deciding the point which has been urged with so much zeal by his proctor. His long residence of thirteen years in the enemy's country is amply sufficient to invest him, by the

laws of war, with the character of an enemy, and subject him to all the disadvantages arising from that character. It is fully established that the vessel was captured within the limits of the enemy's country, when she was about to sail with her cargo under the protection of the flag and pass of the enemy. I shall therefore condemn both vessel and cargo as prize of war to the captors.